# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | |
|---|---|
| CYNTHIA ROBERTSON LUCAS, )<br>)<br>            Plaintiff, )<br>)<br>v. )<br>)<br>CAROLYN W. COLVIN,[1] )<br>Commissioner of Social Security, )<br>)<br>            Defendant. ) | Civil Action No. 7:12-CV-582 |

## REPORT AND RECOMMENDATION

Plaintiff Cynthia Robertson Lucas ("Lucas") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") determining that she was not disabled and therefore not eligible for supplemental security income ("SSI"), and disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433, 1381–1383f. Specifically, Lucas alleges that the ALJ improperly discounted opinions made by a treating source and a consultative examiner.

This court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before me by referral pursuant to 28 U.S.C. § 636(b)(1)(B). The parties have fully briefed and argued all issues, and the case is ripe for decision. I have carefully reviewed the administrative record, the legal memoranda, the arguments of counsel, and the applicable law. I conclude that the ALJ's decision is supported by substantial evidence. Accordingly, I **RECOMMEND**

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is hereby substituted for Michael J. Astrue as the defendant in this suit.

**DENYING** Lucas's Motion for Summary Judgment (Dkt. No. 10), and **GRANTING** the Commissioner's Motion for Summary Judgment. Dkt. No. 13.

## STANDARD OF REVIEW

Section 405(g) of Title 42 of the United States Code authorizes judicial review of the Commissioner's denial of social security benefits. Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). This court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Lucas failed to demonstrate that she was disabled under the Act. "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations omitted). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

Lucas bears the burden of proving that she is disabled within the meaning of the Act. English v. Shalala, 10 F.3d 1080, 1082 (4th Cir. 1993) (citing 42 U.S.C. § 423(d)(5)). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects her ability to perform daily activities or certain forms of work. Rather, a claimant must show that her impairments prevent her from engaging in any and all forms of substantial gainful employment given the claimant's age, education, and work experience. See 42 U.S.C. § 423(d)(2).

The Commissioner uses a five-step process to evaluate a disability claim. <u>Walls v. Barnhart</u>, 296 F.3d 287, 290 (4th Cir. 2002). The Commissioner asks, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment;[2] (4) can return to her past relevant work; and if not, (5) whether she can perform other work. <u>Johnson v. Barnhart</u>, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R. § 404.1520); <u>Heckler v. Campbell</u>, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. The burden shifts to the Commissioner at the fifth step to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); <u>Taylor v. Weinberger</u>, 512 F.2d 664, 666 (4th Cir. 1975).

## STATEMENT OF FACTS

### Social and Vocational History

Lucas was born on June 16, 1967 (Administrative Record, hereinafter "R." at 84), and was considered a younger person under the Act on her alleged onset date. R. 194; C.F.R. §§ 404.1563(c), 416.963. Lucas's last date insured is March 31, 2010. R. 116. She must show that her disability began before that date and existed for twelve continuous months to receive DIB. 42 U.S.C. §§ 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a). Lucas has an associate's degree in science, and previously worked as a beautician (light, skilled work), certified medical assistant (medium, skilled work), janitor (light, unskilled work),

---

[2] A "listed impairment" is one considered by the Social Security Administration "to be severe enough to prevent an individual from doing any gainful activity, regardless of her or her age, education, or work experience." 20 C.F.R. § 404.1525(a).

workout trainer (light, semiskilled work), cashier (light, unskilled work), and receptionist/telephone operator (semi-skilled, sedentary work). R. 84, 107-08, 281, 288, 299. Lucas reported that during the relevant period she had the capacity to cook, wash dishes and clothes, shop, walk her dog, play cards, watch television, and clean. R. 94, 308–15.

## **Claim History**

Lucas protectively filed for SSI and DIB on June 5, 2009,[3] claiming that her disability began on February 25, 2005. R. 17, 257-63. The Commissioner denied the application at the initial and reconsideration levels of administrative review. R. 174–86, 189–99. On July 26, 2011, Administrative Law Judge ("ALJ") Geraldine H. Page held a hearing to consider Lucas's disability claim. R. 14–30. Lucas was represented by an attorney at the hearing, which included testimony from Lucas and vocational expert Gerald K. Wells. R. 81–115.

On August 25, 2011, the ALJ entered her decision denying Lucas's claims. R. 30. The ALJ found that Lucas suffered from the severe impairments of mild degenerative changes of the right hip, degenerative facet arthritis of the lumbar spine, depression, anxiety, bipolar disorder, and substance abuse which was in remission. R. 20. The ALJ found that these impairments, either individually or in combination, did not meet or medically equal a listed impairment. R. 20. The ALJ further found that Lucas retained the RFC to perform light work, but she is limited to occasionally kneeling, stooping, crawling and climbing of stairs; she can frequently balance and crouch; however, she cannot perform work that requires exposure to dangerous machinery, unprotected heights, vibration, ropes, ladders and scaffolds. Lucas is limited to tasks that involve no interaction with the public, and only occasional interaction with supervisors and

---

[3] Lucas filed a previous application on August 15, 2005, which was denied by an ALJ on August 7, 2007. R. 52–66, 67–75, 76–79. The Appeals Council denied Lucas's request for review on March 20, 2009; thus the earliest onset date that can be considered for Lucas's current claim is August 8, 2007, the day after the ALJ's unfavorable decision. R. 275.

4

co-workers. R. 26. The ALJ determined that Lucas could return to her past relevant work as janitor, and can also work at jobs that exist in significant numbers in the national economy: namely: night cleaner, file clerk, and food preparer. R. 28–29. Thus, the ALJ concluded that she was not disabled. R. 30. On September 26, 2012, the Appeals Council denied Lucas's request for review (R. 1–3), and this appeal followed.

## Analysis

Lucas raises a single issue on appeal— whether the ALJ erroneously disregarded the opinions of her treating psychologist Barrie Bondurant, Ph.D., and consultative examiner Tonya McFadden, Ph.D. when determining the limitations imposed by Lucas's mental impairments.[4] On June 3, 2009, Dr. Bondurant completed a medical source statement and assessed Lucas with marked to extreme mental limitations in all mental areas. R. 472–73. On March 14, 2011, Dr. McFadden performed a mental status exam on Lucas and assessed her with mild limitations in understanding, remembering and carrying out simple instructions, and marked limitations in social functioning. R. 545–53.

In the denial decision, the ALJ performed an extensive review of Lucas's mental health treatment records, including the opinions of Drs. Bondurant and McFadden. The ALJ gave Dr. Bondurant's opinion little weight, finding it inconsistent with the evidence from Lucas's treating psychologist. R. 24. The ALJ gave Dr. McFadden's opinion some weight, but found her opinion that Lucas had marked limitation in social functioning unsupported by the record. R. 25. The ALJ concluded that Lucas had no restrictions in activities of daily living, mild to moderate difficulty with social functioning, and moderate difficulty with concentration, persistence and pace. R. 25. Given those restrictions, the ALJ limited Lucas to simple, routine, repetitive

---

[4] Lucas does not contest the ALJ's determination that she had the physical capacity to perform light work. Thus, the court will not address that portion of the ALJ's decision in its analysis.

unskilled work with tasks that require no interaction with the public, and only occasional interaction with supervisors and coworkers. R. 26.

Lucas alleges that the ALJ provided no explanation for her decision to discount the opinions of Drs. Bondurant or McFadden, and instead improperly substituted her own judgment. Pl's Br. at 5–6. Lucas further asserts that the ALJ inaccurately cites the record in her decision, referring to only those records that support her conclusion, and leaving the reader with a skewed view of the record. Pl's Br. at 7.

Lucas's appeal essentially asks the court to re-analyze the facts and re-weigh the evidence; disregarding the substantial evidence standard of review that this court must apply to the ALJ's decision. The issue before this court is not whether it is plausible that a different fact finder could have drawn a different conclusion or even if the weight of the evidence supports a finding of disability. The standard is whether the ALJ's decision is supported by substantial evidence. Having reviewed the record as a whole, I find that substantial evidence supports the ALJ's decision denying Lucas's claims, and recommend that it be affirmed.

Lucas has a significant history of treatment for anxiety, depression, adjustment disorder, and polysubstance abuse. Lucas also has a history of aggression, and was previously hospitalized for psychiatric treatment. R. 462. In January 2005, Lucas received inpatient treatment at Southwestern Virginia Mental Health Institute on a temporary detention order after a suicide attempt. Upon release, Lucas was diagnosed with adjustment disorder with depressed mood, polysubstance dependence in remission, partner relational disorder and a GAF score of 70.[5] Lucas began outpatient treatment at New River Valley Community Services ("NRVCS"),

---

[5] The Global Assessment of Functioning is a numeric scale ranging from 0 to 100 used by mental health professionals to rate social, occupational and psychological functioning "on a hypothetical continuum of mental health illness." Diagnostic and Statistical Manual of Mental Disorders, 32 (4th Ed. Am. Psychiatric Ass'n 1994)

where she met with Lynn Bever, Ph.D., a resident in psychology. Dr. Bever noted Lucas's complaints of anxiety, and issues with alcohol consumption. R. 434, 437, 439. Dr. Bever encouraged Lucas to attend AA and group therapy meetings, increase her exercise and practice breathing techniques. R. 439, 440–42. Lucas noted that she felt anxiety in social situations R. 439.

On April 6, 2007, Dr. Bever reported that Lucas's husband died suddenly of a heart attack. R. 433. Dr. Bever continued to counsel Lucas for the grief, depression, and anxiety she experienced following the death of her husband. R. 419–32.

On May 30, 2007, Lucas was admitted to the New River Valley Community Services Crisis Stabilization Program. Barbara D. Fulcher, a psychiatric nurse practitioner, noted that Lucas had an extensive history of substance abuse, that Lucas lost her husband the month before, and reported increasing depression. R. 371. Lucas reported feeling anxious, and reported past auditory and visual hallucinations. R. 371. Nurse Fulcher diagnosed major depressive disorder, arthritis, acute grief, and a GAF of 52. R. 372. In a follow up medication evaluation and psychiatric assessment, Nurse Fulcher noted that Lucas was no better and no worse, and admitted her to the New Horizons Clinic for stabilization. Lucas asked for medicine that have addictive properties, which were denied due to the risk of relapse. R. 374. Lucas was nervous and anxious, but cognitively intact. R. 375.

Lucas continued to receive counseling treatment at NRVCS for her bipolar disorder, anxiety, depression, and grief over the recent death of her husband. R. 395–96, 406–19, 421–23. Lucas reported worsening depression and irritability, and increasing panic attacks. R. 406–15. In February 2008, Lucas began medication management with Bobby Miglani, M.D. R. 444–54. On

---

("DSM IV"). A score of 61–70 suggests mild symptoms or some difficulty in social, occupational, or school functioning. Id.

November 20, 2008, Dr. Miglani noted that Lucas's symptoms were at a baseline and had not worsened. Lucas complained of occasional environmental stress, but stated that medications help. Lucas denied active psychosis, delusions, suicidal or homicidal ideation, and was competent, alert and oriented. R. 480. Dr. Miglani assessed a history of bipolar affective disorder, a history of polysubstance dependence and a history of anxiety disorder. R. 480. On December 8, 2008, Donald Schumacher, M.S. with NRVCS reported that Lucas was "still quite depressed, but shows signs of humor." R. 494. Lucas reported that she had "put in job applications" because her parents won't let her move back unless she gets disability or gets a job. R. 495. Lucas next reported that her parents agreed to let her move back in with them, and that she continued to look for other employment R. 490.

On May 7, 2009, Dr. Miglani reported that Lucas stopped taking her medication, her mood was unstable, and she made homicidal statements. Lucas was admitted to Southwest State Mental Hospital, and reported that she was inappropriately touched by the person about whom she was making threatening statements. R. 462. Upon discharge, Lucas was back on her medications, feeling better, and less agitated. R. 488.

On June 3, 2009, Dr. Bondurant, one of Lucas's counselors at NRVCS, completed a medical source statement of Lucas's ability to do work related activities (mental). R. 472–73. Dr. Bondurant found that Lucas suffered marked impairments in her ability to understand, remember and carry out short, simple instructions; extreme impairments in understanding, remembering and carrying out detailed instructions and making judgments on simple work-related decisions. Dr. Bondurant also found that Lucas had marked impairments in her ability to interact appropriately with the public, supervisors, co-workers, and in responding appropriately

8

to work pressures and changes in a routine work setting. Dr. Bondurant listed as the support for his assessment his clinical interview and previous counseling sessions. R. 472–73.

On June 6, 2009, Dr. Miglani reported that Lucas regained her baseline, following her most recent hospitalization. She was compliant with medications, and reported no psychotic, delusions, manic, suicidal or homicidal symptoms. R. 475.

Lucas's next few counseling sessions with Dr. Bondurant involved discussing stressors related to her housing and roommates. R. 482–86. On July 23, 2009, Lucas reported that she planned do community service to reduce her fines and help her anxiety and frustration. R. 482. Lucas saw Dr. Miglani on August 20, 2009, and reported some symptoms of mood swings, irritability and sleep disturbance. She denied any symptoms of mania, psychosis, suicidal or homicidal thoughts. Dr. Miglani noted that "a lot of mood changes are in relation to social situations, particularly a difficult housing situation and financial stressors and legal stressors." R. 525. That same day, Dr. Bondurant advised Lucas to find a new living situation. R. 527.

On October 8, 2009, Dr. Bondurant noted that Lucas was living in a trailer on her parents' property and that "[e]verything seems to be going well." R. 524. Dr. Bondurant discussed terminating her relationship with Lucas and referring her to group therapy. R. 524.

Lucas continued to seek medication management with Dr. Miglani from December 2009 through September 2011. Dr. Miglani's treatment notes demonstrate that Lucas was stable on medication, with no indication of psychotic or delusional symptoms, no mania or obsessions, and broadly intact cognition. R. 444–53, 475–80, 525, 557, 559, 561, 563, 565, 573, 575, 577. Lucas continued to experience anxiety, but her mood was stable, and she was consistently neatly groomed, alert and oriented at her appointments. Id.

On January 14, 2010, state agency psychologist Joseph Leizer, Ph.D., examined Lucas's records, and found that she retained the ability to perform simple, unskilled work. R.147–49. Dr. Leizer assessed Lucas with no restriction of activities of daily living, mild to moderate difficulties in maintaining social functioning, and mild to moderate difficulties in maintaining concentration, persistence or pace. R.147–49.

On March 7, 2011, psychologist Tonya McFadden, Ph.D., examined Lucas and completed a medical source statement. Dr. McFadden noted that Lucas was adequately kempt, but appeared anxious and tense throughout the evaluation. Lucas reported intense feelings of anger that may last three to four days, and feeling tense, tired and depressed and down all the time. Lucas reported that she had previously been violent during intense periods of anger. Lucas stated that she currently resided alone, and that she previously lived in her parents' home, which was isolated on the top of a mountain. R. 549–50. On a typical day, she reported that she lets out her dogs, sweeps her house, may go outside, occasionally lays block with her father. She also prepares dinner, washes dishes and watches television. R. 550. She visits with a friend once a month and goes to Wal-Mart about once a week, but is nervous around other people. Dr. McFadden noted that Lucas denied past or present alcohol and substance abuse, but that her records revealed a history of polysubstance dependence. R. 546.

Upon mental exam, Dr. McFadden found that Lucas appeared anxious, and was not an adequate historian. Lucas's speech was relevant and coherent, there was no evidence of distorted thought processes, delusions or hallucinations. She was alert and oriented, her judgment appeared normative, concentration appeared moderately deficient, and her memory was normative and intact. R. 552. Dr. McFadden diagnosed bipolar and anxiety disorder, and assigned a GAF score of 44. R. 552–53.

Dr. McFadden completed a medical source statement on which she indicated that Lucas had a mild restriction with understanding, remembering and carrying out simple instructions; moderate restriction with making judgments on simple work-related decisions, understanding and remembering complex instructions; and marked impairment with carrying out complex instructions and making judgments on complex work-related decisions. Dr. McFadden stated that Lucas reported mood and anxiety symptoms, and her mental status exam revealed moderately deficient concentration and recent memory. Dr. McFadden found that Lucas had marked impairments with interacting appropriately with the public, supervisors, co-workers and responding appropriately to usual work situations and changes in work routine. R. 546. Dr. McFadden specifically noted Lucas's claim that she has been aggressive and was previously arrested for domestic violence. R. 546.

Dr. McFadden summarized her findings, stating:

> This is an individual who presents with a history of mood disturbance and anxiety symptoms. Mental Status Evaluation during this evaluation revealed moderately deficient recent memory and concentration. As a result, it appears that she would have difficulties consistently completing simple and repetitive tasks and to a greater extend detailed or complex tasks. It appears that she may have some difficulties interacting with coworkers and with the public. The claimant did report a history of aggressive behavior. It is believed she would have difficulties dealing with the usual stressors encountered in competitive work.

R. 553.

On April 7, 2011, Dr. Miglani diagnosed bipolar disorder and anxiety disorder, but indicated that Lucas's psychotic features and polysubstance abuse were in remission. R. 565.

Based on the evidence set forth above, the ALJ gave Dr. Bondurant's opinion little weight, finding it inconsistent with the evidence from Lucas's treating psychologist, Dr. Miglani. R. 24. The ALJ gave Dr. McFadden's opinion some weight, but found her opinion that Lucas

11

had marked limitation in social functioning unsupported by the record. R. 25. The ALJ concluded that Lucas had no restrictions in activities of daily living, mild to moderate difficulty with social functioning, and moderate difficulty with concentration, persistence and pace. R. 25. Given those restrictions, the ALJ limited Lucas to tasks that require no interaction with the public, only occasional interaction with supervisors and coworkers, and simple, routine, repetitive, unskilled work. R. 26.

The social security regulations require that an ALJ give the opinion of a treating physician source controlling weight, if he finds the opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). The ALJ must give "good reasons" for not affording controlling weight to a treating physician's opinion. 20 C.F.R. § 416.927(c)(2); Saul v. Astrue, 2011 WL 1229781, at *2 (S.D. W.Va. March 28, 2011). Further, if the ALJ determines that a treating physician's medical opinion is not deserving of controlling weight, the following factors must be considered to determine the appropriate weight to which the opinion is entitled: (1) the length of treatment and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the opinion's support by medical evidence; (4) the opinion's consistency with the record as a whole; and (5) the treating physician's specialization. 20 C.F.R. § 416.927(c)(2)-(5). "None of these factors may be omitted or disregarded by the ALJ in weighing the value of a treating physician's opinion." Ricks v. Comm'r, 2010 WL 6621693, at *10 (E.D. Va. Dec. 29, 2010) (citations omitted).

Here, the ALJ gave Dr. Bondurant's opinion little weight, finding it inconsistent with the notes of Lucas's treating psychiatrist Dr. Miglani. R. 24. Pursuant to the regulations, the opinion

12

of a specialist, such as Dr. Miglani, is entitled to greater weight about medical issues related to his or her area of specialty. 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5).

Lucas's treatment records consistently note her anxiety, sleep difficulty, depression and mood instability. However, the records also reflect that Lucas responded fairly well to medication management by Dr. Miglani. Dr. Miglani consistently noted that Lucas was compliant with her medications, and denied any major changes to her mood, thought, affect, behavior, or cognition. R. 444–53, 475–80, 525, 557, 559, 561, 563, 565, 573, 575, 577. Although Lucas was anxious, she had no psychotic or delusional symptoms, and no active or intermittent suicidal or homicidal ideations. Id. Lucas's mood was stable, and she was consistently neatly groomed, alert and oriented at her appointments. Id. The evidence of treatment and medication monitoring by Dr. Miglani supports the ALJ's determination that Lucas's mental condition was sufficiently stable that she could perform unskilled, repetitive, simple work.

Dr. Miglani had an extensive treatment history with Lucas, while Dr. Bondurant only counseled Lucas three times prior to completing her June 3, 2009 mental assessment. On July 31, 2008, Dr. Bondurant noted that Lucas reported a lot of agitation and irritability. Dr. Bondurant also noted several stressors in Lucas's life: no transportation to attend VASAP class, no license, secluded living in a camper in her parents' yard, no income, grief over her husband's death, and a need to lose weight. R. 498. On February 19, 2009, Dr. Bondurant reported that Lucas was caring for a disabled woman, but having a hard time because her living situation was overcrowded. Lucas was looking for another job. R. 492. On April 2, 2009, Lucas again reported being upset with her living condition because the homeowner was growing marijuana on the porch, and reported that she planned to move back in with her parents. Lucas again

13

reported looking for other employment. R. 490. While these counseling reports reflect Lucas's continuing struggles with external stressors such as income and housing, they do not support Dr. Bondurant's conclusion that Lucas had marked or extreme limitations in all mental aspects. Furthermore, just four months after completing her medical source statement, Dr. Bondurant discussed terminating her counseling relationship with Lucas, and referring her to group counseling, noting "everything seems to be going well." R. 524. Thus, I find substantial evidence supports the ALJ's decision to give little weight to Dr. Bondurant's opinion.

With regard to Dr. McFadden's opinion, there is no merit to Lucas's claim that the ALJ did not adequately consider Dr. McFadden's consultative report. The ALJ discussed Dr. McFadden's findings, gave weight to Dr. McFadden's opinion, and adopted her recommendation that Lucas be limited to simple, routine, repetitive, unskilled work. R. 25. The ALJ did not fully adopt Dr. McFadden's finding that Lucas suffered from marked limitation with social functioning, but instead found mild to moderate difficulties in maintaining social functioning.

At the administrative hearing, Lucas reported that she was living with and taking care of a disabled individual for thirteen months in 2008 and 2009. R. 90–91. She then moved back to her parents' property, and helped them plant trees, mow, work in the garden, clean and lay stones. R. 92, 565. When she completed her application for benefits in 2009, Lucas reported that she lived independently in a trailer, cared for her pets, cooked, cleaned, washed dishes and clothes, went shopping and watched television. R. 308, 310–12, 333. The ALJ considered Dr. McFadden's opinion with regard to Lucas's social functioning, and weighed it together with the other evidence in the record. The ALJ addressed Dr. McFadden's concern about Lucas's limitations in social functioning by limiting Lucas to tasks that require no interaction with the public, and only occasional interaction with supervisors and coworkers. R. 26.

There is no question that Lucas suffers from severe conditions that greatly limit her ability to function. The issue, however, is not whether Lucas has mental impairments or experiences symptoms, but whether those impairments and symptoms prevent her from engaging in competitive employment at the limited range of light, unskilled jobs identified by the vocational expert. The ALJ accounted for the limitations imposed by Lucas's impairments by limiting her to simple, routine, repetitive, unskilled work that involves no interaction with the public, and only occasional interaction with supervisors and co-workers. R. 26. Having reviewed the record as a whole, I find that the RFC determined by the ALJ is consistent with the treatment notes and medical opinions in the record, and is supported by substantial evidence.

## **CONCLUSION**

It is not the province of the court to make a disability determination. The court's role is limited to determining whether the Commissioner's decision is supported by substantial evidence, and in this case, substantial evidence supports the ALJ's opinion. The ALJ properly considered all of the objective and subjective evidence in adjudicating Lucas's claim for benefits and in determining that her mental impairments would not significantly limit her ability to do basic work activities. Accordingly, I recommend that the Commissioner's decision be affirmed, the defendant's motion for summary judgment be **GRANTED**, and Lucas's motion for summary judgment be **DENIED**.

The Clerk is directed to transmit the record in this case to Samuel G. Wilson, United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days hereof. Any

adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such objection.

                                             Enter:  February 10, 2014

                                             *Robert S. Ballou*

                                             Robert S. Ballou
                                             United States Magistrate Judge